# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE SAGECREST II, LLC | |
| | |
| TOPWATER EXCLUSIVE FUND III, LLC, et al., Appellants, | No. 3:10cv978 (SRU) |
| v. | No. 3:10cv979 (SRU) |
| SAGECREST II, LLC, et al., Appellees. | |

## RULING ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

Topwater Exlusive Fund III, LLC and other purported creditors and investors in

SageCrest II, LLC ("SC II"), a debtor hedge fund, appeal the May 18, 2010 order of the United

States Bankruptcy Court for the District of Connecticut approving an agreement to remove SC

II's current manager, settle that manager's administrative claim, and appoint a new interim

manager in its place. For the reasons set forth herein, the bankruptcy court's order is affirmed.

## I.       Background

This case concerns the bankruptcy of four related hedge funds: SC II, a Delaware hedge

fund; SageCrest Finance, LLC ("Finance"), a Delaware subsidiary of SC II; SageCrest Holdings,

Ltd. ("Holdings"), a Bermuda-based subsidiary of SC II that, according to the appellees, controls

77 percent of SC II's assets; and SageCrest Dixon, Inc. ("Dixon"), another Delaware subsidiary

of SC II. The most significant of those hedge funds for the purposes of this appeal is SC II.

SC II is managed by Windmill Management, LLC ("Windmill"); Windmill's principals

are the brothers Alan and Phillip Milton. Windmill manages SC II pursuant to an operating

agreement dated December 18, 2002; as manager, Windmill acts as the hedge fund's executive

and is "vested with the full, exclusive and complete right, power and discretion to operate,

manage and control the affairs of the Company and to make all decisions affecting Company affairs . . . to carry on the business of the Company." Operating Agreement § 5.1. The other parties to this action are the Official Committee of Equity Investors ("Committee"), which represents SC II's equity interests; Topwater Exclusive Fund III, LLC ("Topwater"), a purported investor in and unsecured creditor to SC II; Freestone Low Volatility Partners, LP and Freestone Low Volatility Qualified Partners, LP (collectively, "Freestone"), purported investors in and unsecured creditors to SC II; Wood Creek Multi-Asset Fund, LP ("Wood Creek"), a purported investor in and unsecured creditor to SC II;[1] and ACG Credit Company II, LLC, Art Capital Group, LLC, ACG Financy Company, LLC, Fine Art Finance Company, LLC, and Ian Peck (collectively, "ACG"), unsecured creditors to SC II. Topwater, Freestone, and Wood Creek are pursuing one appeal, while ACG is pursuing a separate appeal; the Committee, along with the four debtor Sagecrest hedge funds, are the appellees. In an order dated July 28, 2010, the two appeals were consolidated (3:10cv978 (SRU), doc. # 14; 3:10cv979 (SRU), doc. # 14) and the appellants filed a joint brief.

On August 17, 2008, SC II and Finance filed for voluntary Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Connecticut; Holdings and Dixon filed for bankruptcy on August 20, 2008 and September 11, 2008, respectively. Those bankruptcies were consolidated before Judge Alan H.W. Shiff. After its bankruptcy filing, SC II became a debtor-in-possession and Windmill continued managing the hedge fund pursuant to the

---

[1] The parties are in dispute whether Topwater, Freestone, and Wood Creek are, in fact, investors in addition to unsecured creditors. Although resolution of that issue may affect whether those appellants have standing to challenge the settlement agreement on the basis that it deprives them of voting rights secured by the SC II operating agreement, I am assuming that such standing exists because, for the reasons set forth below, the bankruptcy court's judgment is affirmed on the merits.

terms of its operating agreement. On March 31, 2009, SC II, Finance, and Dixon filed a joint plan for reorganization; on May 15, 2009, Holdings filed its own plan for reorganization. On June 10, 2009, Judge Shiff granted an order, with the parties' consent, for SC II and the other hedge funds to enter mediation in order to propose a joint consensual plan for liquidating the funds' assets; because of the complexity, illiquidity, and interconnectedness of the funds' assets, Judge Shiff determined that a joint reorganization among all four hedge funds would prove more fruitful than two separate reorganization plans. The bankruptcy court appointed Melanie Cyganowski, former Chief Judge of the United States Bankruptcy Court for the Eastern District of New York, to mediate that settlement. In October 2009, while the mediation was ongoing, the Committee applied to the bankruptcy court to employ Ralph Harrison as a consultant. Harrison had been the managing director and general counsel of SSR Capital Partners, LP ("SSR"), an investor in SC II and a member of the Committee, but had resigned from his positions with SSR in order to consult the Committee. Over Topwater's objection, Judge Shiff approved the Committee's application.

On September 8, 2009, Windmill filed an administrative claim in bankruptcy court seeking payment from the debtor estate for managing the funds' assets during the pendency of SC II's bankruptcy. Windmill sought more than $1 million in its claim. Windmill's administrative claim was contested by several parties, including the appellants, and on December 1, 2009, Judge Shiff ordered the parties to take up the Windmill administrative claim in the mediation sessions before Cyganowski. The debtor, creditors, and Committee all wanted Windmill out: they blamed the Milton brothers for the funds' insolvency and accused them of operating the hedge funds as, essentially, a Ponzi scheme. The Milton brothers, by contrast, wished to be compensated for their administration of the funds during the bankruptcy

proceedings and in securing waivers of liability from the other parties. On March 25, 2010, SC II, Finance, Holdings, Dixon, the Committee, Deutsche Bank, and Windmill entered into a settlement agreement for the Windmill administrative claim and moved for court approval. The settlement agreement included, *inter alia*, the following provisions: (1) Windmill would withdraw its administrative claim and any other claims against the SageCrest hedge funds in exchange for $1,325,000, to be paid in five installments; (2) SC II and the funds agreed not to pursue any legal action against Windmill or the Miltons except for actions premised on their fraudulent or criminal activity; (3) Windmill would withdraw as manager of SC II and the other funds immediately; (4) Ralph Harrison would be appointed as interim manager.

The appellants objected to that settlement agreement on several grounds, including that Harrison could not be appointed interim manager because he was a not a disinterested person as defined in 11 U.S.C. § 327(a); Harrison was appointed interim manager via a process that contravened the rules set forth in the SC II operating agreement for appointing a new manager; the settlement was not fair and equitable, as required under Rule 9019 of the Federal Rules of Bankruptcy Procedure; the settlement plan was not supported by sufficient evidence; and the settlement plan was, in effect, a *sub rosa* liquidation plan, and not a mere settlement of the Windmill administrative claim. In an order dated May 18, 2010, Judge Shiff overruled the appellants' objections to the settlement plan. Specifically, Judge Shiff held: (1) Harrison was not a "professional person" within the ambit of 11 U.S.C. § 327(a) and therefore did not have to be "disinterested" in accordance with that subsection; (2) the process of appointing Harrison did not contravene the operating agreement; (3) the settlement was fair and equitable, based on a balancing of the factors set forth by the Court of Appeals in *Motorola, Inc. v. Official Committee of Unsecured Creditors & JPMorgan Chase Bank, N.A. (In re Iridium Operating, LLC)*, 478

F.3d 452, 462 (2d Cir. 2007); (4) the settlement plan was not a *sub rosa* liquidation plan; and (5) there was sufficient evidence and disclosure to support the bankruptcy court's approval of the settlement agreement.

Following Judge Shiff's order, Windmill and the Milton Brothers withdrew as manager of SC II and Harrison began serving as interim manager. The appellants twice tried to stay Judge Shiff's order and prevent Windmill's withdrawal and the commencement of Harrison's service, first in the bankruptcy court and then in the district court. Both motions for a stay were denied. The appellants subsequently appealed Judge Shiff's approval of the settlement agreement.

## II.    Standard of Review

Under 28 U.S.C. § 158(a)(1), federal district courts enjoy jurisdiction to hear appeals of final judgments, orders, and decrees of bankruptcy judges, including orders approving bankruptcy settlement agreements. *Debenedictis v. Truesdell (In re Global Vision Products, Inc.)*, Nos. 07cv12628 (RDD), 09cv 374 (BSJ), 2009 WL 2170253, at *2 (S.D.N.Y. July 14, 2009). On appeal, a district court will review a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. *In re Flanagan*, 415 B.R. 29, 38 (D. Conn. 2009).

## III.    Discussion

The appellants' arguments for reversal of the bankruptcy court's approval of the Windmill settlement can be divided into two groups. First, the appellants charge that Harrison cannot serve as an interim manager under SC II's operating agreement and the Bankruptcy Code; and, second, that the Windmill settlement as a whole should not have been approved. I address the appellants' claims in that order.

A.     Harrison as interim manager

1.     *Did the appointment of Harrison contravene the Windmill settlement agreement and the SC II operating agreement?*

The appellants present three sub-arguments for why Harrison cannot be appointed interim manager immediately following Windmill's withdrawal.  First, they claim that the settlement agreement only permits Harrison to begin serving as SC II's manager on the settlement agreement's effective date, which is defined in the settlement agreement as "the first date on which . . . each SageCrest Entity Party and subsidiary thereof from which Windmill and/or the Miltons are resigning . . . have taken all corporate action necessary to effectuate such resignation and replace such resigning party, *all in accordance with documents governing such entities and Applicable Law*" (emphasis added).  Windmill Settlement Agreement § 6.3(g).  The effective date has not yet been reached, according to the appellants, because the conditions set forth in the SC II operating agreement — one of the "documents governing" SC II — for replacing the manager have not been met.  Thus, Harrison's appointment violates the terms of the Windmill settlement agreement.

That leads to the second sub-argument.  The appellants contend that the SC II operating agreement conditions the appointment of a new manager on the unanimous approval of SC II's member investors, including the appellants.  Section 6.3 of the SC II operating agreement states: "In the event of the withdrawal, Bankruptcy or incapacity of the Manager, the Company shall be dissolved, unless the Members shall, within 90 days after the occurrence of such withdrawal, Bankruptcy or incapacity, unanimously Consent to continue the Company and unanimously Consent to the election of a new Manager."  No vote was taken among the member investors, however, before Harrison's appointment as interim manager.

The appellants put forward one final reason why Harrison may not be appointed under

the operating agreement. Assuming that Windmill did withdraw and there was no unanimous vote in favor of Harrison's appointment, the operating agreement provides that SC II must then dissolve and a liquidation trustee must be appointed. Harrison could arguably be such a liquidation trustee; in order for that to have occurred, however, Harrison must have been approved by a majority of member investors. SC II Operating Agreement § 8.2. But no vote was ever taken to appoint Harrison.

The appellants' arguments are not persuasive. First, the appellees are correct to counter that Judge Shiff's order approving the settlement agreement does not contradict the terms of the Windmill settlement agreement or the SC II operating agreement. Judge Shiff never ordered Windmill to withdraw, or Harrison to assume his position, as manager in a manner inconsistent with the settlement agreement's terms. On the contrary, all Judge Shiff did was simply approve the proposed Windmill settlement agreement. Windmill's withdrawal and Harrison's appointment occurred subsequent to, and were performed independently of, Judge Shiff's order. Moreover, the terms of the Windmill settlement agreement are not objectionable on their face. The settlement agreement conditions Harrison's appointment on SC II "hav[ing] taken all corporate action necessary to effectuate such resignation and replace such resigning party, all in accordance with documents governing such entities and Applicable Law." In other words, the Windmill settlement agreement incorporates the SC II operating agreement's terms, and the settlement agreement's "effective date" would be the date on which the members unanimously consent to Harrison's appointment as manager pursuant to section 6.3 of the operating agreement or, alternatively, the date on which a majority of the members consent to Harrison's appointment as liquidation trustee pursuant to section 8.2. If there is no inconsistency between the Windmill settlement agreement and SC II's operating agreement, then the appellants have nothing to

appeal with respect to the bankruptcy's court's approval of the Windmill settlement.

Therefore, the appellees are correct that the appellants' first argument is not properly presented as an appeal of the bankruptcy court's order. Rather, it is a complaint about the way the parties complied with the approved plan, i.e., by appointing Harrison in violation of the Windmill settlement agreement and the SC II operating agreement.[2] Framed that way, the appellants' complaint is one that they should have raised to the bankruptcy court in the first instance and not here at the district court in an appeal of Judge Shiff's approval of the Windmill settlement agreement. Nevertheless, Judge Shiff addressed an argument made by the appellants that Harrison's appointment could violate the Windmill settlement agreement the SC II operating agreement. *See* May 18, 2010 at 16-17. I will reach the issue, too, if only to avoid more litigation in the bankruptcy court contesting Harrison's appointment as SC II's manager.

The appellants are correct that the bankruptcy court likely erred by interpreting section 6.3 of the SC II operating agreement to permit Harrison's appointment without a vote by SC II's investors. In his ruling, Judge Shiff read the word "Bankruptcy" in the first sentence of section 6.3 ("In the event of the withdrawal, Bankruptcy or incapacity of the Manager . . . .") to mean SC II's bankruptcy, and not the bankruptcy of Windmill, the manager; from there, he reasoned that SC II had "dissolved" under section 6.3 and the appellants' claim was mooted because they did not represent a majority of investors who could appoint a liquidation trustee under section 8.2. *Id.* That reading of the SC II operating agreement is incorrect, as the appellees conceded at oral argument. The plain meaning of section 6.3 is that the words "withdrawal, Bankruptcy or

---

[2] For that reason, the settlement agreement also does not run afoul of 28 U.S.C. § 2075, which provides that acts taken pursuant to the Federal Rules of Bankruptcy Procedure, such as approving a settlement under Rule 9019, "shall not abridge, enlarge, or modify any substantive right," including rights protected by valid contracts like the SC II operating agreement.

incapacity" all refer to "the Manager," i.e., Windmill, and not SC II. Furthermore, the word "Bankruptcy" in the operating agreement does not have a special meaning limiting it to SC II's bankruptcy; the word, rather, refers to the bankruptcy "of any person," including the manager. Operating Agreement Art. I, page 2. Thus, under section 6.3 of the operating agreement, SC II had not dissolved and the appellants still arguably had voting rights to exercise with respect to Harrison's appointment as interim manager.[3]

The bankruptcy court's decision is affirmed, however, on another ground supported by the record. *See In re Payroll Express Corp.*, 186 F.3d 196, 208 n.4 (2d Cir. 1999) (holding that a court may affirm a lower court's decision on appeal "on any ground appearing in the record, even if not relied upon by the [lower] court"); *Borrero v. Conn. Student Loan Found.*, No. 3:97cv1382 (AHN), 1997 WL 695515, at *1 (D. Conn. Oct. 21, 1997) (same). As a court of equity, the bankruptcy court has the power to excuse compliance with corporate governance rules that threaten the entity's reorganization or risk harming creditors and other interested parties. "It is a truism that a bankruptcy court acting under Chapter XI . . . possesses the powers of a court of equity," the Second Circuit stated in *In re Potter Instrument Co.*, 593 F.2d 470, 474 (2d Cir. 1979). From that principle, the *Potter Instrument* Court held that the bankruptcy court could bar a proposed shareholder meeting and election that was otherwise valid under the debtor's bylaws because the bankruptcy court found that the "such an election . . . would probably jeopardize both [the debtor's] rehabilitation and the rights of creditors and stockholders sounding the 'death knell' to the debtor." *Id.* at 475. *See also Manville Corp. v. Equity Security*

---

[3] I use the word "arguably" because the appellants' status as member investors remains in dispute. If, as the appellees contend, the appellants are only unsecured creditors, then they would have no voting rights under section 6.3 of the operating agreement and no standing to sue on the ground that Harrison was wrongly appointed as manager.

*Holders Comm. (In re Johns-Manville Corp.)*, 66 B.R. 517 (Bankr. S.D.N.Y. 1986) (enjoining shareholder election that threatened to interfere with debtor's reorganization).

Here, the bankruptcy court found that the settlement agreement was essential to the prospect of a quick, efficient, and successful reorganization. The parties, including the appellants, seem to recognize that as well. As the bankruptcy court stated, "The Settlement Agreement proponents and objectors appear to agree that given the complexity of these cases, the illiquidity of the assets, and the difficult current financial markets, it is undisputed that it will be years before any allowed claims will be paid in these cases absent resolution of the issues addressed in the Settlement Agreement." May 18, 2010 Ruling at 10. In addition, the bankruptcy court found that the settlement agreement could not be approved in discrete pieces; rather, the settlement of Windmill's administrative claims was contingent on Windmill's timely withdrawal, and Harrison's timely appointment, as SC II's manager.

> It is apparent that the transition was crafted as part of a global agreement, which involved overlapping and time-sensitive considerations that might unravel if it is considered separately as urged by Topwater. Moreover, the court is persuaded that time is of the essence. Any *de facto* management vacuum must be expeditiously filled as delay will be at the expense of *all* parties — including the [Appellants].

*Id.* at 12-13.

Subjecting Harrison's appointment to the kind of voting process prescribed in sections 6.3 and 8.2 of the SC II operating agreement threatens to upend the Windmill settlement agreement. Each member investor has veto power because installing a new manager requires unanimous consent. That voting system would surely be unacceptable to the settling parties — who, it must be said, represent everyone (the debtors, secured creditors, unsecured creditors, and equity holders) *except* for the appellants — because there are more than 120 member investors. The large number of potential voters poses too great a risk that Harrison would be rejected or

that a single member would hold out in order to leverage some benefit in exchange for its vote. *See* Br. of Appellees at 12 n.8 ("SC II has more than 120 members. To suggest that they could agree unanimously on anything, let alone the selection of a new manager, is purely fanciful . . . ."). Applying the voting procedure of section 6.3 jeopardizes the likelihood that SC II and the other hedge funds will be reorganized effectively and that the funds' assets will not further depreciate in value in the absence of a manager. Moreover, the voting procedure threatens the appellants' own interests. Like everyone else in this case, the appellants do not want Windmill to continue managing SC II. *See* May 18, 2010 Ruling at 15 ("Indeed, Topwater concedes in its Objection that Windmill should be replaced."). Yet, it also appears that a manager must be appointed in order to service SC II's distressed assets and prevent them from declining in value. *See id.* at 13 n.13 (statement of Holdings' counsel concerning the timeliness of appointing a manager). The appellants cannot have it both ways: Windmill cannot be removed without the immediate appointment of a replacement interim manager. Strict application of section 6.3 threatens to prevent that seamless and speedy replacement process.

Finally, it is not clear that the appellants are correct that Harrison's immediate appointment violates the SC II operating agreement. The appellants' argument that Harrison was wrongly appointed assumes that sections 6.3 and 8.2 of the SC II operating agreement continue to apply after SC II has entered bankruptcy. But the text of the operating agreement suggests that assumption is unsound. Sections 6.3 and 8.2 envision a process of private (i.e., non-judicial) dissolution and liquidation of SC II when no replacement is appointed following the manager's withdrawal, bankruptcy, or incapacity. That kind of dissolution and liquidation, however, is not possible following SC II's filing for bankruptcy protection — that is, following SC II's petitioning in bankruptcy court to dissolve its affairs and reorganize under the Bankruptcy Code.

If SC II is unable to be dissolved and liquidated in the voluntary, non-judicial manner

contemplated by sections 6.3 and 8.2, then the voting procedures set forth in those sections lose

their force. In short, sections 6.3 and 8.2 are intended to apply in the case of the withdrawal,

bankruptcy, or incapacity of SC II's Manager when SC II is solvent and not in the midst of

bankruptcy proceedings. To read the sections otherwise would introduce an absurd result: the

private dissolution and liquidation of SC II following the organization's petition to be dissolved

according to processes dictated by the Bankruptcy Code. *See Enercomp, Inc. v. McCorhill Pub.,

Inc.*, 873 F.2d 536, 549 (2d Cir. 1989) ("While we recognize that a contract should not be

interpreted so as to leave any clause expressly included by the parties without effect or purpose,

neither should a clause be interpreted in such a way as to make it absurd." (citations omitted)).

The bankruptcy court was well within its equitable powers to approve the Windmill

settlement agreement, despite that agreement's overriding of the appellant's purported voting

rights under the SC II operating agreement. The bankruptcy court is affirmed on this ground.

2. *Was Harrison a "professional person" within the meaning of 11 U.S.C. § 327(a)?*

The appellants next argue that Harrison could not be appointed as SC II's manager

because he is not a "disinterested" person — or, at a minimum, the appellees failed to prove his

disinterestedness — within the meaning of 11 U.S.C. § 327(a). That argument can be dismissed

for the same reason Judge Shiff gave in his ruling: as manager, Harrison is not a "professional

person" within the ambit of section 327(a). May 18, 2010 Ruling at 14-16. Rather, Harrison is a

"professional person" covered by section 327(b), which does not require him to be disinterested

or to otherwise receive the court's permission to assume his position.

11 U.S.C. § 327 provides, with emphasis:

(a) Except as otherwise provided in this section, the trustee, with the court's
approval, may employ one or more attorneys, accountants, appraisers,

auctioneers, *or other professional persons*, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, *to represent or assist the trustee in carrying out the trustee's duties under this title*.

(b) If the trustee is authorized to operate the business of the debtor under section 721, 1202, or 1108 of this title, and if the debtor has regularly employed attorneys, accountants, or other professional persons on salary, the trustee may retain or replace such professional persons if necessary in the operation of such business.[4]

Both sides concede that, as SC II's manager, Harrison will be a "professional person" — namely, the chief executive of SC II. Where the appellants and appellees part is whether Harrison will be a professional person who will "represent or assist the trustee in carrying out the trustee's duties under this title." *Id.* § 327(a).

The meaning of that phrase is settled. In order to be a professional subject to the disinterestedness requirement of section 327(a), a person must be hired for the purpose of reorganizing the corporation or otherwise assisting it through the Chapter 11 bankruptcy process. *See Comm. of Asbestos-Related Litigants &/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 619-20 (Bankr. S.D.N.Y. 1986) ("[T]he phrase 'professional persons,' as used in § 327(a), is a term of art reserved for those persons who play an intimate role in the organization of the debtor's estate. . . . For the purposes of section 327(a), 'professional persons' is limited to persons in those occupations which play a central role in the administration of the debtor proceeding."). Officers responsible for the day-to-day business of the debtor are not included within section 327(a), and stand in contrast to professionals hired for the sole purpose of reorganizing the debtor organization. *In re Renaissance Residential of Countryside, LLC*, 423 B.R. 848, 858 (Bankr. N.D. Ill. 2010); *In re E-Toys, Inc.*, 331 B.R. 176, 201 (Bankr. D.

---

[4] Although section 327 concerns what the "trustee" may do, 11 U.S.C. § 1107(a) gives the debtor-in-possession the trustee's powers. Thus, section 327 can be read in terms of SC II's powers to appoint Harrison as its interim manager.

Del. 2005); *In re Lyon & Reboli, Inc.*, 24 B.R. 152, 153 (Bankr. E.D.N.Y. 1982). For example, in *In re Phoenix Steel Corp.*, 110 B.R. 141, 142 (Bankr. D. Del. 1989), the bankruptcy court ruled that two "workout specialists" — officers hired by the debtor company in order "to either run that company or utilize its assets for the best interests of the company and interested parties," *id.* — were not subject to section 327(a) because they acted as officers in the course of the debtor's ordinary business, and not as professionals advising, assisting, or navigating the debtor through Chapter 11 bankruptcy. Those officers were held to be regularly employed professionals necessary to the debtor's business pursuant to section 327(b) who can be retained or replaced without court approval. *Id.* A debtor's officers are exempt from section 327(a), as Judge Shiff described, in order for bankruptcy courts "to avoid involvement in traditional management decisions" and, instead, focus on matters relating specifically to the debtor's bankruptcy. May 18, 2010 Ruling at 15.

Harrison is being appointed as SC II's interim manager for the purpose of managing the funds' assets during the pendency of the bankruptcy. It is true that as manager Harrison will wield enormous power. Article V of the SC II operating agreement vests the manager "with the full, exclusive and complete right, power and discretion to operate, manage and control the affairs of the Company and to make all decisions affecting company affairs, as deemed proper, necessary, expedient or advisable by the Manager." SC II Operating Agreement § 5.1. That authority includes the powers to "sell all or any part of the Company assets, whether for cash or other consideration, on such reasonable terms as the Manager shall determine to be appropriate" and to "incur all expenditures permitted by this Agreement and pay all expenses, debts and obligations of the Company." *Id.* § 5.1(d)-(e). But the manager's authority to control and dispose of the debtor's assets — an authority that could affect the distribution of the debtor's

estate upon liquidation or reorganization — does not necessarily render him a section 327(a) professional person. If that were the case, then the workout specialists in *Phoenix Steel* would have been subject to section 327(a). Furthermore, by the appellants' logic, Windmill should have received court approval in order to continue serving as SC II's manager, which no party, including the appellants, has ever demanded. The appellants cite *In re American Tissue, Inc.*, 331 B.R. 169, 173 (Bank. D. Del. 2005), for a list of six factors that, they argue, militate in favor of finding Harrison a section 327(a) professional. What the appellants miss, however, is that the *American Tissue* Court employed those factors only to define the word "professional" in the statute. But being a "professional" is necessary, yet not sufficient, to invoke section 327(a). Rather, in order for section 327(a) to apply, a professional employee must be retained or replaced to assist the debtor's bankruptcy proceedings.

In this case, it is conceded that Harrison is a "professional person." Harrison, however, is being hired to manage the debtor hedge fund's assets while a liquidation plan is prepared and ultimately approved. In other words, he is being appointed interim manager in order to supervise SC II's day-to-day business. Because Harrison will not "represent or assist the trustee in carrying out the trustee's duties under this title," section 327(a) does not apply to him. As a section 327(b) professional, Harrison does not have be disinterested and the bankruptcy court was under no obligation to hold a hearing and demand disclosures or other evidence from the appellees proving Harrison's disinterestedness.[5] The bankruptcy court is affirmed on this ground, too.

---

[5] For that reason, the appellants' arguments about the appellees' failure to disclose information concerning Harrison's disinterestedness are immaterial.

B.    The validity of the Windmill settlement

     1.    *Was the settlement fair and equitable?*

Rule 9019 of the Federal Rules of Bankruptcy Procedure states, "On motion by a trustee, after notice and a hearing, the court may approve a compromise and settlement."  The Rule is silent with respect to what the parties must show in order for the court to approve a proposed settlement.  The courts, however, have developed a standard requiring any settlement to be "fair and equitable."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *Iridium*, 478 F.3d at 462.  In determining whether a proposed settlement meets that standard, courts in this circuit consider the following factors:

> (1) [T]he balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).  Furthermore, a bankruptcy court is not responsible for conducting a searching review to certify a settlement as fair and equitable.  "In undertaking an examination of the settlement, [the] responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quotation omitted).

Judge Shiff considered the Second Circuit's list of factors in his ruling approving the settlement. *See* May 10, 2010 Ruling at 9 (reciting same factors). Specifically, he determined that the Windmill settlement agreement would provide future benefits by replacing SC II's management with Harrison, a professional ready and able to oversee the debtor's assets and maintain their value during the bankruptcy's pendency; that absent the settlement agreement, the litigation of the Windmill administrative claim and the debtor's reorganization would be complex and protracted; and that the debtor, secured creditors, unsecured creditors, and equity holders — essentially, every party other than the appellants — favored the settlement agreement. *Id.* at 10-11. Furthermore, it is worth noting that Judge Shiff is an able and experienced jurist who was familiar with the case when he approved the Windmill settlement agreement, and the settlement was the product of arm's length bargaining overseen by the former Chief Judge of the United States Bankruptcy Court for the Eastern District of New York. Both of those factors further support the bankruptcy court's decision.

In reviewing a bankruptcy court's acceptance of a settlement agreement on appeal, a district court should take a deferential approach.

> A bankruptcy court's approval of a settlement is reviewed extremely deferentially . . . and should not be overturned unless its decision is manifestly erroneous and a clear abuse of discretion. . . . Such a deferential standard is appropriate because a bankruptcy court is in the best position, as the ongoing supervisory court for the bankruptcy proceeding, to determine whether a compromise is in the best interest of the [debtor] estate and is fair and equitable.

*In re Global Vision Products*, 2009 WL 2170253, at *3 (internal quotations and quotation marks omitted). The appellants have put forward no real argument for how the settlement agreement is unfair or inequitable. Given this court's deferential posture and the fact that the settlement appears to meet each of the Second Circuit's factors, the appellants' relative silence on this issue

is not surprising. On this appeal, their complaints principally concern not the substantive

fairness of the settlement terms but, instead, the process by which Judge Shiff approved the

settlement agreement and the evidence supporting his determination, which I take up in the next

section. Nevertheless, Judge Shiff's conclusion that the Windmill settlement agreement was

substantively fair and equitable was not manifestly erroneous or an abuse of discretion.

2.      *Was the settlement agreement supported by sufficient evidence?*

The appellants put forward two different arguments that the appellees presented

insufficient evidence of the settlement's fairness and equity. First, they argue that the district

court failed to collect any facts establishing that the terms of the agreement were fair and

equitable. That argument fails for several reasons, however. To begin, Judge Shiff accepted

some evidence in deciding the appellees' motion for settlement approval, namely, the settlement

agreement, the operating agreement, a transition outline, and a copy of Harrison's resume. May

18, 2010 Ruling at 12 n.12. Although that list of evidence may not be extensive, it constitutes a

factual basis to support the bankruptcy court's order.

Moreover, there is no legal requirement that a bankruptcy court hold an evidentiary

hearing before approving a settlement.[6] *See Depoister v. Mary M. Holloway Found.*, 36 F.3d

582, 586 (7th Cir. 1994) (holding that "[i]t is clear that Rule 9019(a) itself does not expressly

---

[6] *In re RFE Inudustries, Inc.*, 283 F.3d 159, 165 (3d Cir. 2002), is not to the contrary.
The appellants cite it for the proposition that a bankruptcy court must make findings of fact
before approving a settlement. *RFE* does state that, before approving a settlement, a bankruptcy
court must find the existence of factors demonstrating the settlement's fairness and equity. *Id.*
But the decision does not hold that an evidentiary hearing is necessary to accomplish that.
Rather, there must be a minimal amount of evidence presented to permit the court to find that the
settlement is fair and equitable. In *RFE*, the bankruptcy court failed to meet this bare
requirement because it made *no* findings of fact with respect to the Third Circuit's fairness
factors. *Id.* The bankruptcy court was not reversed for failure to hold a formal evidentiary
hearing.

obligate the court to hold an evidentiary hearing prior to approving a compromise under Rule 9019(a)," and that there was no case law supporting the position that an evidentiary hearing was necessary before approving a bankruptcy settlement agreement); *WorldCom*, 347 B.R. at 137 ("It is not necessary for the bankruptcy court to conduct a "mini trial" on the issue.").  Rather, a bankruptcy court meets its responsibility so long as it "'canvass[es] the issues' to determine if the 'settlement falls below the lowest point in the range of reasonableness.'"  *WorldCom*, 347 B.R. at 137 (quoting *In re Teltronics Serv., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985)).  Despite the appellants' protestations, Judge Shiff had enough evidence — especially when combined with his general knowledge of the facts of the bankruptcy proceeding — to determine that the Windmill settlement agreement was fair and equitable under the Second Circuit's factors. Finally, the appellants neither offered any evidence nor demanded an evidentiary hearing when they challenged the Windmill settlement agreement before Judge Shiff.  May 18, 2010 Ruling at 12 n.12.  They are therefore now in an awkward position to complain that the bankruptcy court lacked sufficient facts to support its order.

The appellants' second argument is that the bankruptcy court received inadequate disclosure from the appellees regarding the value of the payments to be made under the settlement agreement.  But the settlement agreement was plain: Windmill will receive $1.325 million in five installments in order to settle its administrative and other potential claims against SC II and, in exchange, Windmill will withdraw as manager.  Windmill's initial administrative claim was for slightly more than $1 million and, likely, the value of that claim would increase while the Milton brothers continued to oversee the debtor hedge fund beyond the date their claim was filed.  Thus, the settlement amount is consistent with Windmill's initial claim for payment. Finally, the settlement payment figure was determined through lengthy mediation overseen by a

qualified and experienced former bankruptcy judge. In light of the disclosure of the payment

value, its correspondence to the initial Windmill administrative claim, and the scrutiny it faced in

the mediation process, the appellants are incorrect that the bankruptcy court received inadequate

disclosure to support its approval of the settlement agreement. There was sufficient evidence to

conclude the settlement was fair and equitable.

3. *Was the settlement agreement a* sub rosa *reorganization plan?*

The appellants' final claim is that the settlement agreement was not, in fact, a settlement

pursuant to Bankruptcy Rule 9019, but a *sub rosa* liquidating or reorganization plan in

contravention of the procedures set forth at 11 U.S.C. § 1129 for confirming a Chapter 11

liquidation plan. "The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-

possession will enter into transactions that will, in effect, 'short circuit the requirements of

Chapter 11 for confirmation of a reorganization plan.'" *Iridium*, 478 F.3d at 466 (quoting

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935,

940 (5th Cir. 1983)). Factors that can turn a settlement agreement into a *sub rosa* plan include

(1) the agreement has the practical effect of dictating the debtor's reorganization; (2) the

agreement infringes creditor voting rights on the debtor's reorganization; (3) the agreement

disposes of large assets belonging to the debtor; and (4) the agreement forced creditors to waive

their claims against the debtor. *In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 355 (5th Cir.

1997); *Braniff*, 700 F.2d at 940. Those factors are not present here. The settlement agreement

does nothing more than use the debtor's assets to resolve Windmill's administrative claim and

replace Windmill as manager. Aside from the $1.325 million — a relatively paltry amount

compared to the total assets belonging to the debtor hedge fund — none of the debtor's assets are

affected by the settlement. Indeed, the assets are arguably enhanced by the appointment of a

new, uncompromised manager. The settlement agreement therefore furthers a legitimate business justification. *See Iridium*, 478 F.3d at 467 (upholding compromise to transfer debtor's assets against challenge that it constituted a *sub rosa* plan because the transfer furthered a "proper business justification").

The debtor's reorganization is unaffected by the replacement of SC II's manager. Although one claim against the debtors has now been paid out, the appellants have made no showing that their claims as unsecured creditors would be prioritized above Windmill's administrative claims or that the settlement otherwise prejudices their rights in SC II's ultimate liquidation and reorganization. Finally, the creditors may continue to press their claims against SC II and anyone else other than Windmill. Indeed, under the terms of the settlement agreement, the creditors may even still sue Windmill, provided that their actions are based on the Milton brothers' fraudulent or criminal conduct.

In sum, the appellants' argument that the settlement agreement is a furtive plan to liquidate or reorganize SC II is unconvincing. The bankruptcy court was correct to dismiss it.

## IV.     Conclusion

For the reasons set forth above, the bankruptcy court's order is affirmed. The clerk is instructed to close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 14th day of January 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge